## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jesse LeBlanc,<br><br>                    Plaintiff,<br><br>v.<br><br>Denis McDonough,[1] in his official capacity as Secretary of the United States Department of Veterans Affairs,<br><br>                    Defendant. | Case No. 19-cv-2401 (SRN/KMM)<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Taylor B. Cunningham and Stacy Deery Stennes, Conlin Law Firm LLC, 600 Highway 169 South, Suite 1650, Minneapolis, MN 55426, for Plaintiff.

Ana H. Voss, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant Secretary Denis McDonough's ("Secretary") Motion for Summary Judgment [Doc. No. 49] and Plaintiff Jesse LeBlanc's Motion for Partial Summary Judgment [Doc. No. 51]. Based on a review of the files, submissions, and proceedings herein, and for the reasons stated below, the Court **GRANTS**

---

[1] Denis McDonough is now the Secretary of the Department of Veterans Affairs. Consequently, under Rule 25(d) of the Federal Rules of Civil Procedure, he is automatically substituted for Robert Wilkie, the former Secretary. *See* Fed. R. Civ. P. 25(d).

Defendant's motion for summary judgment and **DENIES** Plaintiff's motion for partial summary judgment.

## I.    BACKGROUND

### A.    The Parties

Plaintiff LeBlanc served as a police officer with the Department of Veterans Affairs Medical Center in St. Cloud, Minnesota ("VAPD") from 2012 to 2018. (First Cunningham Decl. [Doc. No. 56] Ex. 7 ("First LeBlanc Decl.") ¶ 1.)

Defendant McDonough is the Secretary of the Department of Veterans Affairs ("VA") and, as the head of the VA, is subject to suit under 42 U.S.C. § 2000e-16(c).

### B.    The VAPD

Police departments within the VA, including the VAPD, are expected to provide law enforcement services and physical security at their assigned facility around the clock, every day. (Blumke Decl. [Doc. No. 67] ¶ 3; *see id.*, Ex. 3 at 3.) At the VAPD, the scheduling of patrol officers' shifts is governed by the "Panama Schedule." According to the "Panama Schedule," officers work in teams of two. (*Id.* ¶ 5.) In a two-week period, two teams will work only day-shifts, from 8:00a.m. to 8:00p.m., and two teams will work only night-shifts, from 8:00p.m. to 8:00a.m. (*See id.*, Ex. 4.) Then, in the next two-week period, the two teams that worked day-shifts in the prior period work only night-shifts, and the two teams who worked night-shifts in the prior period work only day-shifts. (*See id.*) Because there are two teams working only day-shifts and two teams working only night-shifts in a given two-week period, each team works seven twelve-hour shifts within each two-week period. (*See id.*)

2

Eric Blumke became interim Chief of Police of the VAPD in January 2018 and was hired as Chief of Police in April 2018. (Blumke Decl. ¶ 2.) As Chief of Police, Chief Blumke is responsible for implementing VAPD policies and practices and for staffing and hiring within the VAPD. (*Id.*) He was also Mr. LeBlanc's second-line supervisor. (*Id.*)

### C.     Mr. LeBlanc's Request for Reasonable Accommodation

In 2017, Mr. LeBlanc was diagnosed with vestibular dysfunction and, as a result, suffered from dizziness and other symptoms. (*See* First Cunningham Decl., Exs. 1-4 (medical records).) Like all other VAPD officers, Mr. LeBlanc's work schedule followed the "Panama Schedule." As his disease progressed, he became concerned that this schedule was exacerbating the symptoms of his disease. (First LeBlanc Decl. ¶¶ 2-3.) To address this issue, on February 6, 2018, Mr. LeBlanc submitted to the VAPD a written request for accommodation. (*See* Cunningham Decl., Ex. 9 ("Request for Accommodation").) He requested the following accommodations:

> "1.     A work schedule with a stable pattern.
> 2.     Limited night shifts.
> 3.     Limited short notice schedule changes.
> 4.     Limited overtime.
> 5.     Limited weekend shifts.
> 6.     Ability to call in for sick leave on short notice, if needed.
> 7.     Ability to limit distractions, if needed.
> 8.     Allowed mobility and not confined to a singular work station."

(*Id.*)

Along with his Request for Accommodation, Mr. LeBlanc supplied Dr. Charity Hovre, who then served as the St. Cloud VA Medical Center's Equal Employment Opportunity Program Manager, with various medical records supporting his diagnosis and

describing his symptoms. (*See* Hovre Decl. [Doc. Nos. 71, 72] ¶¶ 2, 6, Ex. 34.) In one instance, Mr. LeBlanc's medical provider stated that: "It would be recommend[ed] that he has more of a regular schedule during daytime rather than 2 night and 2 day back and forth type of shifts." (*Id.* at 8.)

Dr. Hovre testified that Mr. LeBlanc verbally told her sometime in February or March that he "need[s] a day shift schedule." (Cunningham Decl., Ex. 8 ("Hovre Dep.") at 46:21-47:7.) Mr. LeBlanc testified that he viewed "limited" night shifts as meaning "less than the normal rotation." (LeBlanc Dep. [Doc. No. 60] at 71:2-5.)

### D.    Mr. LeBlanc's Interim Accommodation

Dr. Hovre and Chief Blumke offered Mr. LeBlanc an Interim Accommodation while the VA considered his Request for Accommodation. (Thieschafer Decl. [Doc. No. 79] Ex. 27 ("Interim Accommodation").) The Interim Accommodation provided that Mr. LeBlanc would "be placed on day shift rotation distributed in a fair and equitable manner across the 7 days of the week effective immediately for a period of 3 months so that together we can determine the effectiveness of the accommodation in alleviating the symptoms of your condition and to determine the impact on the workflow and unit." (*Id.* at 1.)[2] Dr. Hovre determined that Mr. LeBlanc needed a day-shift schedule "[b]ecause when [she] talked

---

[2] Mr. LeBlanc and Chief Blumke signed the Interim Accommodation on April 28, 2018, but other records suggest that the Interim Accommodation was implemented at an earlier date, likely sometime in March 2018. (*See, e.g.*, Blumke Decl., Ex. 6 (Mr. LeBlanc's March 16, 2018 email informing his colleagues of his day-shift accommodation); Ex. 9 (Chief Blumke's March 29, 2018 email referencing Mr. LeBlanc's Interim Accommodation).)

with him upon receipt of his documentation and he told [her] he wanted stable day shifts, and [she] reviewed his medical notes that suggested his symptoms would be improved if he worked day shifts rather than going between days and nights, [she] put those things together and said let's do a trial of days and he was in agreement with that." (Hovre Dep. at 65:18-66:1.) Finally, the Interim Accommodation provided that Chief Blumke would consider Mr. LeBlanc a "last resort" when he needed someone to take a short-notice schedule change or overtime. (Interim Accommodation at 1.)

On March 16, 2018, Mr. LeBlanc sent an email to the VAPD officers stating that the "main accommodation" he requested was "that [he] not work the night shifts." (*See* Blumke Decl., Ex. 6.) He explained that his medical providers believed that making this change would "greatly improve [his] overall health." (*Id.*) Before sending this email to his colleagues, Mr. LeBlanc sent a draft of it to Dr. Hovre. (Hovre Dep. at 114:14-21.)

On April 5, 2018, Chief Blumke sent Dr. Hovre an evaluation of how the Interim Accommodation was affecting the VAPD. (Blumke Decl., Ex. 7.) He explained his concerns that: (1) other patrol officers had to voluntarily change their schedules to cover Mr. LeBlanc's assigned night-shifts; (2) he had to pay overtime compensation to certain officers covering Mr. LeBlanc's night-shifts; and (3) he had to have a non-patrol officer cover some of Mr. LeBlanc's night-shifts, resulting in that officer's other responsibilities lacking coverage during that time. (*Id.*) According to Chief Blumke, the VAPD was already experiencing hardships arising from staffing issues, and the Interim Accommodation only "exacerbated" those hardships. (*Id.*)

On May 1, 2018, Dr. Hovre and Chief Blumke met with Mr. LeBlanc to discuss whether the Interim Accommodation was working for him. (Hovre Decl., Ex. 31.) Mr. LeBlanc stated that his symptoms were "much better." (*Id.*) After this meeting, Mr. LeBlanc submitted additional medical records dated April 30, 2018. (*See* Hovre Decl. [Doc. Nos. 71, 72] ¶ 15, Ex. 32.) In these records, Mr. LeBlanc's doctor stated that she "feel[s] that if he was allowed regular, routine work hours during the daytime, vs. the alternating day/night shifts, [she] believe[s] that he could be able to function better on a daily basis, as evidenced by his history of having worsening dizziness with the switch in schedules." (*Id.*) On May 9, 2018, Dr. Hovre sent an email to Chief Blumke and Mr. LeBlanc to summarize and confirm their May 1, 2018 "accommodation interactive meeting." (Hovre Decl., Ex. 17.) She reiterated that, to date, Mr. LeBlanc indicated that his symptoms have improved since he started only working day-shifts. (*Id.* at 2.)

Mr. LeBlanc concurred with Dr. Hovre's summary of their May 1, 2018 meeting and offered several additional comments. (*Id.* at 1.) He stated that the lack of night shifts "has been successful," and that he could "switch, rotate, or work some overtime" as "last resorts or if changes benefit both parties involved." (*Id.*) He also stated that "it was agreed by my primary, specialty, and physical therapy providers that a maintained, stable, patterned, predictable, day rotational schedule with minimal disruption would allow for constant sleep patterns, diet, exercise, and personal life planning, all in which would assist with minimizing affects [*sic*] from my disability." (*Id.*)

At some point, likely in 2018,[3] Mr. LeBlanc attended a vocational rehabilitation informational consult to receive "an overview of available vocational services, and to begin the vocational assessment process." (Voss Decl. [Doc. Nos. 73, 74] Ex. 35.) The progress notes from this consult provide that "[i]t was recommended by his providers that he have stable day time hours; fixed schedule to control/diminish symptoms. [Mr. LeBlanc] notes that when working daytime hours and no more than 40 hours a week his symptoms were better and at time[s] not even present." (*Id.*) At his deposition, Mr. LeBlanc testified that "[w]hat I had in mind is that it would be nice to have more days, but I didn't want to work as much overtime. I preferred more days than nights." (LeBlanc Dep. at 81:3-6.)

When asked how she assesses whether a requested accommodation can be granted, Dr. Hovre described her process as follows:

> I look at the condition, the accommodation they're asking for and what the duties are of the position, and if those match up, we can grant. And if they don't match up or I have questions, I will ask a management official; sometimes I do that separately, sometimes with the employee together. If I still am not sure, then I'll ask a second-line official or general counsel.

(Hovre Dep. 20:2-13.) In this case, Dr. Hovre decided to consult with general counsel. (*See id.* at 50:19-51:18.) VA policy requires a consultation with the National Reasonable Accommodation Coordinator or the Regional Office of General Counsel before a request for accommodation may be denied. (McCallum Decl, Ex. 1 ("RA Policy") § 21.)

---

[3] This medical record is undated, but includes a "printed on" date of December 10, 2018.

### E.        The Master Agreement

From 2011 through 2018, the VA and the American Federation of Government Employees ("AFGE") were parties to a collective bargaining agreement ("Master Agreement"). (*See* Kormelink Decl. [Doc. No. 66] Ex. 2 (Master Agreement).) As relevant here, the Master Agreement provides as follows: "Scheduled off-tours shall be rotated fairly and equitably among affected employees, i.e., day/evening, day/night." (*Id.*, art. 21, § 3(E).)[4] Karen Kormelink, a Human Resources Consultant at the VA who helped to negotiate the Master Agreement, explained that this provision means that, when an entire office has a rotating shift schedule, "you can't just assign someone to all days, all evenings or all nights"; rather, the rotation of shifts has to occur on a "fair and equitable basis." (Kormelink Dep. [Doc. No. 63] at 11:14-12:6; *see also* Kormelink Decl. ¶¶ 2-3.)

On May 11, 2018, the VA's counsel advised Chief Blumke and Dr. Hovre to deny Mr. LeBlanc's Request for Accommodation based on the Master Agreement's requirement that off-tours be rotated fairly and equitably among affected workers. (Thieschafer Decl., Ex. 24.) Counsel reasoned that, if the VAPD provided Mr. LeBlanc his requested accommodation, the VAPD would be in violation of the Master Agreement, and Mr. LeBlanc's colleagues, who had to work extra night-shifts, could file valid grievances. (*Id.*) Consequently, counsel determined that granting Mr. LeBlanc's requested accommodation would qualify as an undue hardship because it would cause the VAPD to breach the Master

---

[4] The term "off-tours" refers to "a shift other than the day shift." (Kormelink Decl. ¶ 7.)

Agreement. (*Id.*) As a result, counsel advised Chief Blumke and Dr. Hovre to deny Mr. LeBlanc's Request for Accommodation and offer him instead reassignment to another position. (*Id.*)

### F.   The VA's Reassignment of Mr. LeBlanc

On May 15, 2018, Chief Blumke met with Mr. LeBlanc and Dr. Hovre to issue a final accommodation request determination, offering Mr. LeBlanc reassignment to another position. (Thieschafer Decl., Ex. 28 at 1.) Chief Blumke wrote that this accommodation would ensure that Mr. LeBlanc's needs were met in another position without violating the Master Agreement. (*Id.*) Dr. Hovre acknowledged that reassignment is an accommodation of last resort, but that it was necessary here. (*See* Hovre Dep. at 69:12-18.)

### G.   Mr. LeBlanc's Request for Reconsideration

Mr. LeBlanc then submitted a request for reconsideration of the VA's determination that reassignment was the appropriate accommodation for his disability. (Thieschafer Decl., Ex. 22.) In this request, Mr. LeBlanc asserted that neither he nor his doctor ever stated that he could not work night-shifts. (*Id.* at 2.) Rather, he argued that he and his doctor have only stated that a "day-shift schedule would help to improve [his] symptoms," and this does not "suggest that [he] cannot periodically conduct night duty if needed." (*Id.*)

On May 25, 2018, Dr. Hovre, Mr. LeBlanc, a union representative, and Ms. Thieschafer—the Associate Director of St. Cloud's VA Medical Center—met as part of the reconsideration process. (Thieschafer Decl. ¶¶ 2, 6; Hovre Decl. ¶ 16.) At this meeting, Mr. LeBlanc stated that he "never felt better" than he did while working with the Interim Accommodation. (Hovre Decl., Ex. 33 at 1 (Dr. Hovre's notes of meeting.) He also stated

9

that he could get notes from four doctors saying that he could work night-shifts and that he interpreted the doctor's note he previously furnished to the VA as conveying only that it "would be nice to have days." (*Id.* at 2.) After this meeting, however, he did not in fact ask any doctor for such a note nor did he provide any further medical documentation. (LeBlanc Dep. at 124:15-18; Hovre Decl. ¶ 15.)

Thereafter, on June 4, 2018, Ms. Thieschafer, who served as the secondary reviewer of Mr. LeBlanc's Request for Accommodation, denied Mr. LeBlanc's request for reconsideration. (Thieschafer Decl., Ex. 23 at 1; *see id.* ¶ 3.) First, she noted that she had been informed that his medical records "connect working night-shift hours with triggering or exacerbating [his] symptoms." (*Id.* at 2.) Second, she found that providing a schedule of only day-shifts would violate the Master Agreement. (*Id.*) Third, she updated the accommodation request determination form and clarified that the sole reason for denial was that granting it would violate the Master Agreement. (*Id.*) Finally, she found that, after reviewing the entire record, reassignment to a position with a stable day-shift schedule was appropriate and justified. (*Id.*)

Mr. LeBlanc accepted the offer of reassignment on June 28, 2018, and approximately a week and a half later, he was hired as a transportation assistant at the VA. (*Id.* at 3; *see* First Cunningham Decl., Ex. 22 (Notification of Personnel Action).) Approximately one year later, in July 2019, Mr. LeBlanc left his position at the VA for a position in the private sector. (*See* LeBlanc Dep. at 12:8-18.)

### H.      Mr. LeBlanc's Pursuit of Other Positions Within the VAPD

Around the time that Mr. LeBlanc was reassigned, he specifically applied for positions as a detective and as a training instructor within the VAPD. He was not selected for either position.

For the detective position, a panel of three current or former VAPD employees interviewed Mr. LeBlanc and two others who applied for the position—Mason Hlady and Edward Weaver. This hiring process only involved one panel interview, and Chief Blumke was not a panelist, although he had the ultimate authority to select the finalist. (*See* Blumke Dep. at 111:9-20.) The three panelists scored the applicants as follows: (1) Mr. Hlady – 99; (2) Mr. LeBlanc – 90; and (3) Mr. Weaver – 74. (Peterson Decl. [Doc. Nos. 69, 70] Ex. 21.) Chief Blumke ultimately decided to hire Mr. Hlady for this position. (Blumke Dep. at 108:9-11.)

As for the training instructor position, at least initially, the interview process was the same as the process used for the detective position. (*See* Blumke Aff. [Doc. No. 82] at USA_00001640-41.) The interview panel consisted of the same panelists, and the panelists utilized the same scoring method. (*Id.* at USA_00001641.) The three applicants for this position were the same three as those who applied for the detective position. The three panelists scored the applicants as follows: (1) Mr. LeBlanc – 131; (2) Mr. Hlady – 116; and (3) Mr. Weaver – 114. (Peterson Decl., Ex. 21.) Chief Blumke acknowledged that Mr. LeBlanc's total score was  "significantly higher" than Mr. Weaver's score. (Blumke Dep. at 132:18-22.)

After this interview, Chief Blumke was advised that Mr. LeBlanc allegedly made several comments to a third party suggesting that he would flee if an active shooter situation arose. (Blumke Dep. at 145:16-24.) On May 29, 2018, using the subject line "Rumor Assistance," Chief Blumke emailed Mr. Hlady's wife, Nicole Hlady, the following:

> I'm looking for some information I have heard third or fourth hand regarding an officer. If you could help me, I'm looking for the name of an Officer who, when asked about active threat, said he would run. I don't want to put you in the middle of anything and I will not use your name but I am also looking for who the officer said this to.
>
> Any help would be appreciated.

(Blumke Decl., Ex. 12 at 3.) In her reply to Chief Blumke, Ms. Hlady identified "Jesse" as the officer who made these comments. (*Id.*) She also stated that she "didn't hear it first hand but Sarah Zastrow told me." (*Id.*)

Chief Blumke then emailed Ms. Zastrow, a nurse who works at the VA, to ask what she knew about this "startling" information. (*Id.* at 1.) Ms. Zastrow replied that she was "not exactly sure when the conversation took place," but that she thought it occurred during a staff training. (*Id.*) She stated that she heard Mr. LeBlanc comment that VAPD are not required to confront active shooters and that, if he was involved in such a situation, he would flee and not confront the shooter. (*Id.*) Although Chief Blumke was concerned about this alleged comment, he did not investigate it further and did not discuss it with Mr. LeBlanc. (Blumke Dep. at 135:24-137:10.) Mr. LeBlanc denies ever making this statement to anyone. (Second Cunningham Decl. [Doc. No. 83] Ex. 36 ("Second LeBlanc Decl.") ¶ 2.)

In part due to his concerns about this rumor, Chief Blumke decided to hold a second round of interviews for the training instructor position on June 5, 2018. (*See* Blumke Dep. at 138:17-22.) Instead of the original three interview panelists, Chief Blumke and Jeff Smith, an administrative officer who worked for Ms. Thieschafer, conducted the interviews of Mr. LeBlanc and Mr. Weaver. (*See* Blumke Decl., Ex. 14 at 5, 10, 15; Smith Decl. [Doc. No. 75] ¶ 3.)[5] During these interviews, Chief Blumke and Mr. Smith asked questions to address the rumor involving Mr. LeBlanc. (Blumke Dep. at 138:23-139:7.)

After the interviews, Chief Blumke and Mr. Smith scored both candidates. They assigned the same scores to Mr. LeBlanc in all seventeen scoring categories, with each arriving at a final score of 49. (*See* Blumke Decl., Ex. 14 at 2-20.) They did the same for Mr. Weaver, with each arriving at a final score of 62. (*See id.*)

Unlike the first round of interviews, Chief Blumke also requested references from three people who worked at the VAPD in various police roles and knew both Mr. LeBlanc and Mr. Weaver in professional capacities: (1) Michael Trerotola; (2) Edward Brown; and (3) John Armstrong. (*See* Blumke Decl. ¶ 48; *id.*, Ex. 15 at 1.) They provided references for both Mr. Weaver and Mr. LeBlanc. (*See generally* Blumke Decl., Ex. 15.) In general, Mr. Trerotola offered a positive reference for Mr. Weaver, while his reference for Mr. LeBlanc was less favorable. (*See id.* at 1-4.) Mr. Brown provided generally positive references for both Mr. Weaver and Mr. LeBlanc. (*See id.* at 5-7.) Mr. Armstrong offered

---

[5] By this time, Mr. Hlady had already accepted the detective position and, therefore, did not participate in the second round of interviews for the training instructor position. (*See* Blumke Decl. ¶ 44.)

a positive reference for Mr. Weaver and a less favorable reference for Mr. LeBlanc. (*See id.* at 8-11.)

Chief Blumke testified that he considered these references before making his hiring decision. (Blumke Dep. at 172:20-173:1.) The Summary of Merit Promotion Activities indicates that Chief Blumke selected Mr. Weaver for the training instructor position on "~6/5/2018." (*See* Second Cunningham Decl. [Doc. Nos. 83, 84] Exs. 32, 33.) Chief Blumke stated that he decided to hire Mr. Weaver for the training instructor position based on the scores from the second interviews, their application materials, and his experiences with and knowledge of both candidates. (Blumke Decl. ¶ 49.)

## II.    PROCEDURAL HISTORY

On August 30, 2019, Mr. LeBlanc commenced this action, alleging five counts. (*See* Compl. [Doc. No. 1].) Subsequently, he withdrew Counts 2 and 3, which alleged disability discrimination with respect to his removal from his police officer position and his non-selection for the detective position. (*See* Am. Compl. [Doc. No. 42] ¶¶ 52-59 (Count 2), ¶¶ 60-64 (Count 3).)[6] Consequently, only Counts 1, 4, and 5 remain. In Count 1, Mr. LeBlanc alleges that the VAPD failed to accommodate him in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq*. (*Id.* ¶¶ 43-51.) In Count 4, he alleges that he suffered discrimination on the basis of his disability when he was not selected for the training instructor position, in violation of the Rehabilitation Act. (*Id.* ¶¶ 65-70.) In

---

[6] In his briefing, Mr. LeBlanc stated that he no longer wished to prosecute Count 3. (*See* Pl.'s Opp'n at 6 n.3.) At oral argument, he advised the Court that he was withdrawing Count 2 as well.

Count 5, he alleges that he was not chosen for the training instructor position in retaliation for requesting a reasonable accommodation, in violation of the Rehabilitation Act. (*Id.* ¶¶ 71-77.) Here, Mr. LeBlanc moves for summary judgment on Count 1, and the Secretary moves for summary judgment on all Counts.

## III.   DISCUSSION

### A.   Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, summary judgment is properly entered "against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

### B.     Failure to Accommodate Claim Under the Rehabilitation Act

First, the Court considers Mr. LeBlanc's claim under the Rehabilitation Act for failure to accommodate. An employer violates the Rehabilitation Act when it fails to make reasonable accommodations for the known physical or mental limitations of an employee who has a disability, unless the accommodation would impose an undue hardship on the employer. *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004) (citing 29 C.F.R. § 1630.9(a)). A reasonable-accommodation claim does not depend on the discriminatory intent of the employer, but rather on whether the employer failed to fulfill an affirmative duty to reasonably accommodate the disabled employee's limitations. *Id.* at 767. Therefore, when considering a failure-to-accommodate claim at summary judgment, the court does not apply the familiar *McDonnell Douglas* framework but, instead, applies a "modified burden-shifting analysis." *Id.* (quoting *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003)).

Under this modified burden-shifting analysis, the plaintiff must make a prima facie showing that he: (1) has a disability; (2) suffered an adverse employment action; and (3) is

a "qualified individual."[7] *See Fenney*, 327 F.3d at 712.[8] The plaintiff must also show that the requested accommodation was "reasonable on its face, *i.e.*, ordinarily or in the run of cases." *Peebles*, 354 F.3d at 768. The burden then shifts to the defendant to show "special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Id.*

Here, the parties do not dispute that Mr. LeBlanc has a disability and that he is a qualified individual. (*See* First Cunningham Decl, Ex. 23 (stipulation signed by both parties); Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Opp'n") [Doc. No. 87] at 3.) However, the Secretary argues that Mr. LeBlanc cannot make a prima facie showing that he suffered an adverse employment action because the VA offered him a reasonable accommodation in the form of a reassignment, which he accepted. (Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") [Doc. No. 77] at 20, 24-25.) Further, the Secretary contends that the VA was not required to offer Mr. LeBlanc his requested accommodation because doing so would breach the terms of the Master Agreement and therefore would be an undue hardship. (*Id.* at 20-24.)

---

[7] To be a "qualified individual," a plaintiff must "(1) possess the requisite skill, education, experience, and training for his position, and (2) be able to perform the essential job functions, with or without reasonable accommodation." *Denson v. Steak 'n Shake, Inc.*, 910 F.3d 368, 371 (8th Cir. 2018) (internal quotation marks and citations omitted).

[8] In general, cases interpreting the ADA, such as *Fenney*, are applicable to cases interpreting the Rehabilitation Act. *See Hill v. Walker*, 737 F.3d 1209, 1216-17 (8th Cir. 2013) ("decisions interpreting either the ADA or the Rehabilitation Act are applicable and interchangeable to claims under each statute").

In response, Mr. LeBlanc argues that his reassignment was an adverse employment action because the position to which he was reassigned paid less and changed his working conditions. (Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. ("Pl.'s Mem.") [Doc. No. 53] at 17-18.) He further argues that reassignment was not a reasonable accommodation because: (1) it is an accommodation of last resort; and (2) the VA could have provided a reasonable accommodation of Mr. LeBlanc's working conditions as a police officer. (*Id.* at 18-26; Pl.'s Reply in Supp. of Mot. for Partial Summ. J. ("Pl.'s Reply") [Doc. No. 88] at 2-4.)

The Court agrees with the Secretary. First, Mr. LeBlanc has not made a prima facie showing that he suffered an adverse employment action. An adverse employment action is "a tangible change in working conditions that produces a material employment disadvantage." *Sellers v. Deere & Co.*, 791 F.3d 938, 942 (8th Cir. 2015) (citations omitted). Here, his reassignment was a reasonable accommodation, tailored to satisfy his Request for Accommodation, and therefore, it does not constitute an adverse employment action. *See* 42 U.S.C. § 12111(9) (listing "reassignment to a vacant position" as a reasonable accommodation); *Ford v. Marion Cty. Sheriff's Office*, 942 F.3d 839, 856 (7th Cir. 2019) ("We do not see how the reassignment could be simultaneously a reasonable accommodation and an adverse employment action.").

It is true that reassignment is "an accommodation of last resort" when an employee cannot be accommodated in his current position. *Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803, 814 (8th Cir. 2015) (citation omitted). It is nevertheless an accommodation. *See* 42 U.S.C. § 12111(9). After considering the relevant facts and circumstances, the VA

determined that it could not reasonably accommodate Mr. LeBlanc in his current position and that reassignment was an appropriate and justified course. Even though Mr. LeBlanc would have preferred an accommodation that kept him in his police officer position, he was "not entitled to an accommodation of his choice." *Rehrs v. Iams Co.*, 486 F.3d 353, 359 (8th Cir. 2007) (citation omitted).

Further, even if Mr. LeBlanc could make the required prima facie showing, the Secretary has nevertheless shown that the VA would suffer undue hardship by granting the requested accommodation. An employer is not required to "take action inconsistent with the contractual rights of other workers under a collective bargaining agreement." *Faulkner v. Douglas Cnty. Neb.*, 906 F.3d 728, 734 (8th Cir. 2018) (quoting *Benson v. Nw. Airlines, Inc.*, 62 F.3d 1108, 1114 (8th Cir. 1995)). Further, "an accommodation that would cause other employees to work harder, longer, or be deprived of opportunities is not mandated." *Rehrs*, 486 F.3d at 357. Here, the VA decided not to grant Mr. LeBlanc's request for "limited night shifts" because doing so would run afoul of the terms of the Master Agreement, which require that night-shifts "be rotated fairly and equitably" among VAPD officers.

Mr. LeBlanc also contends that the VA failed to engage in an "interactive process" with him. To determine the need for, and nature of, a reasonable accommodation, the employer and employee must engage in an "interactive process." *Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 902 (8th Cir. 2009). There is no per se liability under the Rehabilitation Act for an employer's failure to engage in an interactive process, but such evidence may be prima facie evidence that the employer is acting in bad faith. *Cravens v.*

*Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1021 (8th Cir. 2000) (citation omitted). An employee claiming that the employer failed to engage in an interactive process must demonstrate that: (1) the employer knew about the disability; (2) the employee requested an accommodation or assistance for the disability; (3) the employer did not make a good faith effort to assist the employee in seeking an accommodation; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. *Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002); *see* 29 C.F.R. § 1630.2(o)(3). Here, it is undisputed that the VA knew about Mr. LeBlanc's disability and that he requested a reasonable accommodation. Consequently, only the third and fourth prongs are disputed.

As to the third prong, Mr. LeBlanc concedes that the VA initially engaged in an interactive process with him from February 2018 through early May of 2018. However, he contends that after early May of 2018, the process broke down. (Pl.'s Mem. at 27-31.) Specifically, he believes that, after Dr. Hovre consulted with general counsel, the VA should have made further efforts to identify an accommodation other than reassignment. In response, the Secretary argues that the VA's interactions with Mr. LeBlanc from the time he filed his Request for Accommodation in February 2018 through the time Ms. Thieschafer affirmed Chief Blumke's reasonable accommodation decision in June 2018 were more than sufficient to satisfy its obligation to engage in an interactive process. (Def.'s Mem. at 26-29; Def.'s Opp'n at 8-10.)

The Court agrees with the Secretary. The undisputed evidence shows that the VA sufficiently engaged in an interactive process. In his Request for Accommodation, Mr.

LeBlanc expressly requested "limited night shifts." In February or March, before the Interim Accommodation began, Mr. LeBlanc verbally told Dr. Hovre that he needed a schedule consisting of day-shifts. On March 16, he told his colleagues that the "main accommodation" he requested was that he "not work the night shifts," and he shared this email with Dr. Hovre before sending it to his colleagues. On May 1, Dr. Hovre and Chief Blumke met with Mr. LeBlanc to discuss how the Interim Accommodation was working for him, and he indicated that working day-shifts was helping to alleviate his symptoms. Mr. LeBlanc submitted additional medical documentation after this meeting, and on May 9, Dr. Hovre emailed Chief Blumke and Mr. LeBlanc to summarize the in-person meeting on May 1. Mr. LeBlanc concurred with Dr. Hovre's summary and added that not working night-shifts had been successful for him and that he could only work night-shifts as a "last resort." He further advised Dr. Hovre and Chief Blumke that his medical providers agreed that "a maintained, stable, patterned, predictable, day rotational schedule" would be best for him.

In his written request for reconsideration, he reiterated his desire to work "limited night shifts." Mr. LeBlanc also met with Ms. Thieschafer, Dr. Hovre, and a union representative on May 25 to discuss his request for reconsideration. At this meeting, he advised them that he "never felt better" than he did while working with the Interim Accommodation. He also stated that he could get notes from four doctors saying that he could work night-shifts, but after the meeting, he did not ask any doctor for such a note nor did he provide any further medical documentation. Only after all of these interactions did the VA reach a final decision that reassignment was appropriate and justified. "The point

of engaging in an interactive process is to discover[] a means by which an employee's disability could have been accommodated." *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 98 (2d Cir. 2015) (internal quotation marks and citations omitted). Mr. LeBlanc's interactions over several months with various VA personnel accomplished exactly that end. There is no evidence to the contrary in the record.

As to the fourth prong, Mr. LeBlanc contends that he could have been reasonably accommodated but for the VA's lack of good faith. (Pl.'s Mem. at 31-33.) According to Mr. LeBlanc, the VA failed to consider other reasonable accommodations consistent with Mr. LeBlanc's position as a police officer. In response, the VA argues that reassignment was the only reasonable accommodation available and so it was justified. (Def.'s Mem. at 29-31.)

The Court agrees with the Secretary. During their interactions, Mr. LeBlanc made clear to VA personnel that he was requesting to work fewer night-shifts. Because reducing the number of Mr. LeBlanc's night-shifts would have been an undue hardship for the reasons discussed above, the VA reasonably declined to accept Mr. LeBlanc's proposed accommodation and instead offered him reassignment. And Mr. LeBlanc has not shown that his reassignment was unreasonable. "If an employer has offered reassignment as a reasonable accommodation, then the employee must offer evidence showing both that the position offered was inferior to [the employee's] former job and that a comparable position for which the employee was qualified was open." *Gardea v. JBS USA, LLC*, 915 F.3d 537, 542 (8th Cir. 2019) (quoting *Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 933 (8th Cir. 2012)). Here, the transportation assistant position to which Mr. LeBlanc was

reassigned had a lower salary and, therefore, may be considered inferior. *See id.* However, the record evidence shows that no comparable position within the VAPD was available. (*See* Blumke Decl. ¶ 17; Hovre Decl. ¶ 17.) Mr. LeBlanc points to no evidence indicating otherwise. Consequently, Mr. LeBlanc fails to show that his reassignment was unreasonable. *See Gardea*, 915 F.3d at 542-43.

Finally, Mr. LeBlanc contends that the holding in *Barnes v. Northwest Iowa Health Ctr.*, 238 F. Supp. 2d 1053 (N.D. Iowa 2002), should guide the Court's decision in this case. (Pl.'s Mem. at 32-33.) However, *Barnes* is distinguishable. There, the employer made an offer of employment to the plaintiff but retracted it after it determined that the plaintiff could not perform the job's essential functions due to a disability without exploring a potential accommodation. *Id.* at 1060-62. In denying the employer's motion for summary judgment on the plaintiff's reasonable-accommodation claim, the court found that the plaintiff had "no opportunity to interact with, much less request accommodation, before [the employer] unilaterally concluded that there existed no accommodations." *Id.* at 1087. Here, in contrast, Mr. LeBlanc requested an accommodation and then interacted with VA personnel extensively over several months. In the end, the VA concluded that the only reasonable accommodation available was reassignment.

### C.     Disability Discrimination Claim Under the Rehabilitation Act

Next, the Court considers Mr. LeBlanc's claim that the VA discriminated against him on the basis of his disability when it declined to hire him for the training instructor position. Under the Rehabilitation Act, no "otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability" be subjected to

discrimination under any program or activity of an executive agency. *Peebles v. Potter*, 354 F.3d 761, 765 (8th Cir. 2004) (quoting 29 U.S.C. § 794(a)). In the absence of direct evidence of intentional discrimination, courts analyze claims brought under the Rehabilitation Act using the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *Id.* at 766. In this case, the parties do not identify any direct evidence of discrimination and so the Court analyzes Mr. LeBlanc's claim using the *McDonnell Douglas* framework.

The *McDonnell Douglas* framework utilizes a three-step process, which first requires the plaintiff to establish a prima facie case of discrimination. *Didier v. Schwan Food Co.*, 465 F.3d 838, 841 (8th Cir. 2006). To establish a prima facie case of disability discrimination under the Rehabilitation Act, a plaintiff must show that he: (1) was disabled; (2) was otherwise qualified to do the essential job with or without reasonable accommodation; and (3) was not selected for the position solely because of his disability.[9] *Id.* If the plaintiff meets his burden, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the action complained of by the plaintiff. *Id.* If

---

[9] Cases interpreting the ADA or the nondiscrimination provision of the Rehabilitation Act are generally interchangeable for purposes of analyzing discrimination claims under either law. *See Folkerts v. City of Waverly, Iowa*, 707 F.3d 975, 983 (8th Cir. 2013). However, an "important difference between the two acts is that the Rehabilitation Act imposes a requirement that a person's disability serve as the *sole* impetus for a defendant's adverse action against the plaintiff." *Wojewski v. Rapid City Regional Hosp., Inc.*, 450 F.3d 338, 344 (8th Cir. 2006) (internal quotation marks and citation omitted) (emphasis in original).

the defendant does so, the burden shifts back to the plaintiff to show that the defendant's stated reason is merely pretext for its discrimination. *Id.*

Here, the parties agree that Mr. LeBlanc made a prima facie showing of discrimination. (*See* Def.'s Mem. at 33; First Cunningham Decl, Ex. 23 at 1-2 (stipulation signed by both parties). The parties also agree that the VA articulated a legitimate, non-discriminatory reason for Mr. LeBlanc's non-selection (*i.e.*, that Mr. LeBlanc was not the best candidate based on the evidence, his references, and the results of the second round of interviews, among other factors). (*See* Pl.'s Opp'n at 16-17.) Consequently, the issue is whether Mr. LeBlanc met his burden of showing that the VA's stated reason for his non-selection is merely pretext for disability discrimination.

To demonstrate pretext, a plaintiff must offer "sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason." *Treanor v. MCI Telecommunications Corp.*, 200 F.3d 570, 576 (8th Cir. 2000) (quoting *Wilking v. Cty. of Ramsey*, 153 F.3d 869, 874 (8th Cir. 1998)). A plaintiff cannot meet this burden by "simply showing that the reason advanced by the employer was false; rather, [the plaintiff] must demonstrate that a discriminatory animus lies behind the defendants' neutral explanations." *Wilking*, 153 F.3d at 874 (internal quotation marks and citations omitted). Specifically, a plaintiff "must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination." *Id.*

According to the VA, Chief Blumke acted within his lawful discretion by considering the evidence related to the alleged statements by Mr. LeBlanc concerning an

active shooter scenario, his references, and the results of the second round of interviews in determining that Mr. LeBlanc was not the best candidate for the position. (Def.'s Mem. at 32-36; Def.'s Reply in Supp. of Mot. for Summ. J. ("Def.'s Reply") [Doc. No. 89] at 3-4.)

In response, Mr. LeBlanc argues that the concern about his alleged statements regarding an active shooter scenario was not actually a reason for his non-selection because it lacked credibility and was simply a cover-up for disability discrimination. (Pl.'s Opp'n at 17-21, 23-26.) He further argues that Chief Blumke and Mr. Smith used their evaluations from the second round of interviews to manipulate the hiring process and ensure that Mr. LeBlanc would not be hired. (*Id.* at 21-22.)

The Court agrees with the Secretary. Mr. LeBlanc has not offered evidence that Chief Blumke's proffered reason for non-selection was pretextual, nor that disability discrimination was the real reason for non-selection. *See Treanor*, 200 F.3d at 576. Because courts "do not sit as super-personnel departments," the "pretext" inquiry focuses solely on whether evidence in the record shows that a business's action against an employee involved intentional discrimination, not on the "wisdom or fairness" of those business judgments as a general matter. *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 955 (8th Cir. 2012) (internal quotation marks and citations omitted). In other words, "[w]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the Court's] province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Wilking*, 153 F.3d at 873. Although Mr. LeBlanc denies making any such statement about an active shooter scenario, he points to no evidence suggesting that disability discrimination motivated the non-

selection decision. As a result, he fails to identify a genuine issue of material fact in dispute as to pretext.

### D.     Retaliation Claim Under the Rehabilitation Act

Finally, the Court considers Mr. LeBlanc's claim that he was not chosen for the training instructor position in retaliation for requesting a reasonable accommodation. To state a prima facie claim for retaliation under the Rehabilitation Act, a plaintiff must show that: (1) he engaged in a statutorily protected activity; (2) the employer took an adverse action against him; and (3) there was a causal connection between the adverse action and the protected activity. *Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013) (citation omitted). Such a claim requires a "but-for causal connection" between the employee's statutorily protected activity and the employer's adverse action against him. *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 758 (8th Cir. 2016). If a plaintiff makes his prima facie showing, then the court proceeds with the burden-shifting framework under *McDonnell Douglas*. *See Hill*, 737 F.3d at 1218.

Here, the parties agree that Mr. LeBlanc engaged in a statutorily protected activity (*i.e.*, requesting a reasonable accommodation) and that the VA took an adverse action against him (*i.e.*, declining to hire him for the training instructor position). (Def.'s Mem. at 39; Def.'s Reply at 4 n.5.) However, the parties dispute whether Mr. LeBlanc has shown a causal connection between his request for accommodation and Chief's Blumke's decision not to hire him.

In general, "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation."

*Auer v. City of Minot*, 896 F.3d 854, 860 (8th Cir. 2018) (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc)). And even if such a "temporal connection" exists, evidence about "intervening" conduct by the plaintiff will "erode any causal connection that was suggested by [that] temporal proximity," and will accordingly entitle a defendant-employer to summary judgment. *Kiel*, 169 F.3d at 1136.

According to Mr. LeBlanc, the temporal proximity between his Request for Accommodation and his non-selection for the training instructor position shows that there is a causal connection between the two. (Pl.'s Opp'n at 29-30.) He further argues that the alleged active shooter statement could not constitute an intervening act because Chief Blumke did not investigate it further, showing that he was not truly concerned by it. (*Id.* at 30-31.) In the VA's view, temporal proximity alone is insufficient to create a causal connection here, and the alleged active shooter statement did constitute an intervening event that eroded any causal connection that may have existed. (Def.'s Mem. at 38-40; Def.'s Reply at 4.)

The Court agrees with the Secretary. Although Mr. LeBlanc asserts that there is evidence beyond temporal proximity to support the existence of a causal connection, he does not point the Court to any such evidence and instead focuses on the temporal proximity. (*See* Pl.'s Opp'n at 29-32.) But "more than a temporal connection … is required to present a genuine factual issue on retaliation." *See Auer*, 896 F.3d at 860. Further, even if the temporal proximity supports a causal connection, knowledge of the alleged active shooter statement, several less than supportive references, and a second round of interviews all intervened. In addition, even if a reasonable jury could find for Mr. LeBlanc on

causation, he has failed to meet his burden with respect to "pretext." Indeed, Mr. LeBlanc points to no evidence that retaliation for requesting a reasonable accommodation motivated the VA's decision.

## IV.     CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Doc. No. 49] is **GRANTED**; and

2. Plaintiff's Motion for Partial Summary Judgment [Doc. No. 51] is **DENIED**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: July 22, 2021                                   s/Susan Richard Nelson
                                                       SUSAN RICHARD NELSON
                                                       United States District Judge